UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| KEVIN SIMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 1:13-cv-1263-SLD-JEH |
| ELIZABETH ROBB, CASEY COSTIGAN, | ) | |
| ROBERT FRIETAG, JASON CHAMBERS, | ) | |
| CITY OF BLOOMINGTON, RANDALL | ) | |
| MCKINLEY, TIM STANESA, PAUL | ) | |
| WILLIAMS, HENRY CRAFT, RANDALL | ) | |
| WIKOFF, GAYLE CYRULIK, JEFFREY | ) | |
| ENGLE, SHAWN ALBERT, MARK | ) | |
| ASHMORE, RON SHRIVER, GARY | ) | |
| SUTHERLAND, BILL YODER, JANE | ) | |
| FOSTER, SCOTT BENNETT, MIKE | ) | |
| EMERY, STEPHANIE JONES, SARAH | ) | |
| QUAH, and MARK QUAH, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Kevin Simpson is the former police reporter for The Pantagraph, a newspaper based in Bloomington, Illinois. In his seven-count Complaint, ECF No. 1, he claims that between 2010 and 2013, several judges, members of the law enforcement community, prosecutors, the City of Bloomington, and private citizens violated his civil rights. The heart of Simpson's complaint is his belief that the Defendants' conduct had devastating and unwarranted effects on his custody rights over his two sons. Before the Court are thirteen motions (and one amended motion) to dismiss, which collectively cover all of the claims against each of the twenty-three Defendants. Mots. Dismiss, ECF Nos. 10, 14, 16, 19, 24, 34, 36, 38, 44, 47, 50, 59, and 64. Also before the Court is Simpson's Motion to Submit Evidence, ECF No. 100. For the

1

reasons outlined below, the Motions to Dismiss are GRANTED, and the Motion to Submit Evidence[1] is MOOT.

## BACKGROUND

At the motion to dismiss stage, well-pleaded facts alleged in the complaint are taken as true and all inferences are drawn in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Accordingly, the Court rests its decision on the following factual allegations:

### I.      Defendants Robb, Costigan, and Frietag

Elizabeth Robb is the chief judge of the Eleventh Judicial Circuit in Illinois. Casey Costigan and Robert Frietag are judges in the Eleventh Judicial Circuit in McLean County, Illinois. Judge Costigan presided over a child custody matter involving Simpson, which Simpson identifies as 01-D-135. Compl. ¶¶ 90–94, 95–104, ECF No. 1. Some of Judge Costigan's rulings were adverse to Mr. Simpson, starting around June 17, 2011. *Id.* ¶¶ 90–94, 95–104, 127, 132–35, 149–52, 156, 158, 162–63. On August 26, 2011, Judge Costigan was interviewed by Sergeant Randy Wikoff, another Defendant, at the Bloomington Police Department in regard to a "stalking case" against Simpson. *Id.* ¶ 105. Judge Costigan's statements to Sgt. Wikoff were allegedly "contrary to Simpson's court statements and evidence." *Id.* ¶ 106. In April 2012, Simpson wrote a letter to Judge Costigan asking him to recuse himself. Judge Robb set a hearing for a Motion to Substitute Judge Costigan. *Id.* ¶ 129–30. The motion was denied. *Id.* ¶ 131. On November 27, 2012, Simpson filed a complaint against Judge Costigan with the Illinois Inquiry Board. He also named Judge Costigan as a Defendant in

---

[1] Mislabeled on the Docket as a Response to Defendant Jones's Motion to Dismiss.

*Simpson v. City of Bloomington et al*, No. 12-cv-1430 (C.D. Ill. 2013). *Id.* ¶ 156. He again

sought recusal, by motion, of Judge Costigan due to Judge Costigan's meeting with Sgt. Wikoff.

*Id.* ¶ 152.

Judge Frietag presided over a felony criminal case against Simpson; the charge, for

intimidation, was filed on June 11, 2011. *Id.* ¶¶ 89, 107–08, 110–11. Lieutenant Paul Williams

sent an email to Judges Frietag, Robb, and Costigan on August 29, 2011, stating that Simpson

had criticized Judge Costigan and the judicial system to Judge Frietag. *Id.* ¶ 110. Simpson

alleges that Frietag did not disclose the communications to him. *Id.* ¶ 111. On October 7, 2011,

Simpson was arrested for a bond violation, and Frietag set bond at $200,000 three days later. *Id.*

¶ 118–19. Because he could not post bail, Simpson was jailed for four and a half months

pending trial. *Id.* ¶ 120. On February 23, 2012, despite an adverse evidentiary ruling by Judge

Frietag, Simpson was acquitted by a jury of the intimidation charge, which Defendant Assistant

State's Attorney Jane Foster had reduced to a misdemeanor. *Id.* ¶ 123–24.

On August 18, 2011, Simpson filed a complaint against another Defendant, Sheriff Mike

Emery, to Judge Robb in her capacity as a member of the courthouse security committee. *Id.*

¶ 99. On December 28, 2012, Simpson was arrested on allegations of criminal threats against

Judges Robb and Costigan. *Id.* ¶ 167. On February 5, 2013, he pleaded guilty to one count of

intimidation. *Id.* ¶ 178. He later moved to withdraw his plea. *Id.* ¶ 183. Mr. Simpson also

alleges that between March 27, 2013, and April 2, 2013, Judge Robb must have modified a

hearing transcript from his recent criminal proceedings. *Id.* ¶ 185.

## II.        Defendant McKinley

Randall McKinley was the chief of the Bloomington Police Department ("BPD") during the events described in the Complaint.  In January of 2011, McKinley sent emails to police officers describing Simpson as a malcontent and saying that complaints he had lodged against the department were unfounded.  Compl. ¶ 55.  On February 19, 2011, McKinley was informed that Simpson intended to ask the Illinois State Police to investigate misconduct.  *Id.* ¶ 57.  Shortly afterward, the State's Attorney's Office began investigating Simpson.  *Id.*

On March 5, 2011, Simpson filed a complaint that McKinley deemed unfounded.  *Id.* ¶ 64.  On May 9, 2011, McKinley claimed Simpson was threatening officers.  *Id.* ¶ 70.  On May 12, 2011, McKinley asked the Sheriff to have Simpson followed while in the McLean County Law and Justice Center.  In a May 13, 2011 email, McKinley notified officers that the State's Attorney's Office was planning to prosecute Simpson, and asked officers to contact McKinley if they arrested Simpson, and not to deal with Simpson alone lest he accuse them of misconduct.  *Id.* ¶ 75; McKinley Mot. to Dismiss, Ex. A.[2]  On May 15, 2011, McKinley banned Simpson from city property, citing threats made by Simpson.  Compl. ¶ 77.  On October 6, McKinley called State's Attorney Bill Yoder regarding Simpson's arrest.  *Id.* ¶ 117.

## III.        Defendant Engle

Officer Jeffrey Engle is a police officer in the BPD.  On November 5, 2009, Engle arrested Simpson.  Compl. ¶ 17.  Engle made inflammatory remarks about Simpson's children,

---

[2] In the Complaint, Simpson mischaracterizes this email, attached by Chief McKinley to his Motion to Dismiss, as calling for Simpson's arrest.  *See* Compl. ¶ 75; *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (observing that it is "well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss" (citation omitted)).

ex-wife, and family, and later denied that he had done so. *Id.* Engle allegedly falsified some details in a police report of this event. *Id.* An investigation of Engle's behavior found no misconduct. *Id.* ¶ 18.

On June 3, 2011, Engle allegedly wrote a secret letter to administrative staff at BPD claiming that Simpson was attempting to harass him by driving slowly by his house. *Id.* ¶ 83. On August 15, 2011, Engle wrote a letter to McKinley stating: "It is a matter of when Kevin does something and to whom." *Id.* ¶ 95. The same letter allegedly contained statements falsely attributed to a friend of Simpson's. *Id.* Engle testified on August 17, 2011, at a deposition in which he related facts similar to those in the allegedly secret letter. *Id.* ¶ 96. On September 9, Engle filed a police report related to the earlier stalking incident. *Id.* ¶ 114. On July 4, 2012, Simpson was driving near Engle's house, and, when Simpson slowed down, Engle reportedly yelled "bitch" and "You're gonna get yours," and "Don't worry about it." *Id.* ¶¶ 137–138.

## IV. Defendant Williams

Paul Williams is a lieutenant in the BPD. On August 29, 2011, Williams stated in an email to Judges Frietag, Robb, and Costigan that Simpson had been "highly agitated" and had criticized Costigan and the judicial system generally. Compl. ¶ 110. These statements were allegedly false. *Id.* Williams also stated that Simpson was "fixated" on Costigan, allegedly in order to alarm Costigan and other judges. *Id.* ¶ 111.

## V. Defendant Wikoff

Randall Wikoff is a sergeant in the BPD. In an investigation of a complaint filed by Simpson in 2009, Wikoff allegedly "whitewashed" misconduct by Engle. Compl. ¶ 12. In

internal investigations conducted some time afterward, Wikoff allegedly overlooked illegal statements and actions in exonerating other officers of wrongdoing. *Id.* ¶ 56.

On November 29, 2010, Simpson filed a federal lawsuit, Docket No. 10-CV-1394, against multiple defendants in the BPD, including Wikoff. Compl. ¶ 53. The complaint was subsequently dismissed as to Wikoff.[3] On August 26, 2011, Wikoff interviewed Simpson at the BPD offices, allegedly for the purposes of framing Simpson for stalking. Compl. ¶ 105. On October 6, 2011, Wikoff allegedly conspired with McKinley, Sara Quah, Tim Stanesa, Casey Costigan, Bill Yoder, and Jane Foster to arrest Mr. Simpson for disorderly conduct. *Id.* ¶ 251. This alleged conspiracy resulted in Mr. Simpson's arrest on October 7, 2011. *Id.* ¶ 252.

## VI.        Defendant City of Bloomington

Plaintiff makes many allegations about City of Bloomington employees over the course of his Complaint, as well as about individuals not employed by the City of Bloomington but who participated with City of Bloomington employees in various ways that Plaintiff alleges violated his civil rights. Plaintiff's allegations about those defendants are summarized in the sections of this Order that pertain to particular defendants. Plaintiff makes only one specific allegation about the City itself. The City of Bloomington and Chief McKinley allegedly did not adequately train, supervise, or provide investigative oversight for Citizen Complaints via the Office of Professional Standards. Compl. ¶ 229–31.

---

[3] The Complaint states that Sgt. Wikoff was "dropped" from the suit. Compl. ¶ 80. However, the court's order in the case indicates that the complaint was dismissed as to Sgt. Wikoff. Order at 7, *Simpson v. Engle*, No. 10-CV-1394, 2011 WL 2014813 at *3 ((C.D. Ill. May 24, 2011). *See Anderson v. Simon*, 217 F.3d 472, 474–75 (7th Cir.

## VII.        Defendant Cyrulik

Gayle Cyrulik was a sergeant with the BPD during the time covered by the Complaint. Cyrulik exonerated Officer Ron Shriver of wrongdoing in relation to a child custody dispute in September 2010.  Compl. ¶ 28.  In exonerating Officer Mark Ashmore in a separate complaint filed by Mr. Simpson, Cyrulik allegedly did not consider information provided by Simpson that Simpson had been cleared by DCFS. *Id.* ¶ 49.  Cyrulik allegedly overlooked illegal actions in exonerating these BPD officers.  *Id.* ¶ 56.

## VIII.       Defendant Stanesa

Tim Stanesa is a lieutenant in the BPD.  On February 23, 2011, Stanesa allegedly arranged for other BPD officers to harass Simpson during a court hearing.  Compl. ¶ 58.  Stanesa did not, at the same hearing, correct what the Complaint describes as perjury by Quah.[4]  On the same day, Stanesa requested extra BPD patrol of Simpson's home.  *Id.* ¶  60.  On Feb. 28, 2011, Stanesa waited at Simpson's house for Simpson to arrive home.  Compl. ¶ 62.  During their subsequent conversation. Stanesa allegedly made unspecified false statements in an effort to dissuade Simpson from pursuing charges against the Quahs.  *Id.*  Stanesa was responsible in other unspecified ways for creating a bad impression of Simpson within the BPD.  *Id.* ¶ 212.  Stanesa allegedly participated in a conspiracy against Simpson with named BPD defendants and others.  *Id.* ¶ 222.  On June 11, 2011, the Complaint states, Stanesa conspired with Officers Craft, Engle, and Albert, and Mark and Sarah Quah, to engineer Mr. Simpson's arrest.  *Id.* ¶¶ 242, 248, 263.

---

2000) (stating that a court "may take judicial notice of matters of public record without converting the 12(b)(6) motion into a motion for summary judgment").

**IX.        Defendants Mark and Sarah Quah**

Mark and Sarah Quah were Simpson's neighbors during much of the time covered by the Complaint.  On November 10, 2010, Sarah Quah contacted the Illinois Department of Children and Family Services ("DCFS") with allegedly false information relating to a domestic incident that had occurred at Mr. Simpson's home on September 25, 2010.  Compl. ¶ 50.  She or her husband allegedly perjured himself or herself in later testimony about the incident on February 23, 2011.  *Id.* ¶ 59.  On June 11, 2011, the Quahs called the BPD complaining that Simpson was playing his stereo too loudly.  Compl. ¶ 87.  The Quahs allegedly then participated in the manufacture of a "threat allegation" against Mr. Simpson.  *Id.* ¶  88.

**X.        Defendant Jones**

Stephanie Jones is Simpson's ex-wife, and was, over the course of the time covered in the Complaint, involved in a child custody dispute with Simpson.  On September 11, 2010, Jones told her son to run away from Simpson's house.  Compl. ¶ 22.  Later, Jones told police that Simpson had hit their child.  *Id.* ¶ 24.  On September 13, Jones told Illinois DCFS that Simpson had hit their child.  Id. ¶  29.  On September 24, Jones conveyed their children to Simpson, telling the children to keep the prior allegations of abuse secret.  *Id.* ¶ 30.

On September 25, Jones made unspecified allegations to the BPD.  *Id.* ¶ 34.  On September 28, Jones filed for an Order of Protection, basing her request on certain unspecified misrepresentations.  *Id.* ¶ 42.  On October 15, Jones tried to get Simpson to agree to supervised visits of their children.  *Id.* ¶ 45.  During June 2012, Jones did not allow Simpson to see their

---

[4] The Complaint does not specify whether Sarah or Mark Quah allegedly committed perjury at this hearing.  Compl. ¶ 59.

child during three scheduled visitation periods.  Compl. ¶ 134.  She also "altered" a court order. *Id.*

XI.              **Defendants Albert, Ashmore, Craft, Shriver, and Sutherland**

Henry Craft is a sergeant at the BPD.  Shawn Albert is an officer at the BPD.  Mark Ashmore is an officer at the BPD.  Ron Shriver was an officer at the BPD during the time covered by the Complaint.  Gary Sutherland is an officer at the BPD.  Because these five Defendants filed a joint Motion to Dismiss, the Court summarizes the facts with respect to these officers together.

Shriver did not inform Simpson that Jones had made complaints against him sometime on or before September 11, 2010, when Simpson called the BPD with regard to a child custody argument with Jones.  Compl. ¶ 25.  On October 15, Shriver repeated some of Jones's allegations of abuse in a "response letter."  *Id.* ¶ 27.  On September 25, 2010, Simpson called the BPD during a disagreement with his son's grandmother.  *Id.* ¶ 31.  Shriver and Ashmore arrived and attempted to dissuade Simpson from taking his son home.  *Id.*  On the same day, Sutherland allegedly "staged a false call" to permit Shriver and Ashmore to go to Simpson's house.  *Id.* ¶ 35.  Ashmore and Schriver took Simpson's son into protective custody.  *Id.* ¶ 36.  In a report that he wrote of the event, Ashmore did not include certain information favorable to Simpson.  *Id.* ¶ 37.  The same day, Ashmore told a DCFS caseworker that Simpson had pushed his child down, an account which allegedly differed from his police report.  *Id.* ¶ 41.  Ashmore later made the same claim in an Order of Protection hearing on October 15.  *Id.* ¶ 44.

On May 7, 2011, Ashmore went to Mr. Simpson's house after Simpson was assaulted by a neighbor.  Compl. ¶ 66.  Simpson then refused to deal with Ashmore and told him repeatedly to

leave. *Id.* ¶ 67. Craft, who was also on the scene, refused Simpson's request for a supervisor, saying, "I guess he doesn't need our help." *Id.* That same day, Simpson rode his bicycle to the BPD station and gave Craft an account of Ashmore's conduct. *Id.* ¶ 68. On May 13, Simpson was detouring around a crash site where Ashmore was directing traffic. *Id.* ¶ 74. Ashmore falsely claimed that Simpson interfered with the traffic investigation. *Id.*

On June 10, Sutherland allegedly fabricated a statement that he had warned Simpson about his radio being too loud. *Id.* ¶ 85. On June 11, Simpson called Craft to complain about what he regarded as various false statements made by BPD officers, including those of Sutherland. *Id.* ¶ 87. Also on June 11, Craft and Albert allegedly conspired with Mark and Sarah Quah to create a "false" felony allegation against Simpson. *Id*. ¶ 242.

On June 17, Albert testified at a family hearing involving Simpson. *Id.* ¶ 90. Albert testified, allegedly falsely, that Simspon had threatened Sarah Quah's children, and described Simpson's earlier arrest, also allegedly falsely. *Id.* ¶ 91. Judge Costigan suspended Simpson's custody of his children and ordered a psychiatric evaluation of Simpson. *Id.* ¶ 92.

## XII.      Defendants Chambers, Yoder, Foster, and Bennett

Jason Chambers is the McLean County State's Attorney ("SA"). Bill Yoder was the McLean County SA during some of the events described in the Complaint. Jane Foster was an Assistant State's Attorney ("ASA") during the time period covered in the Complaint. Scott Bennett is an ASA. Since these four defendants are or were all prosecutors, and all move to dismiss on the basis of prosecutorial immunity in the same motion, the Court summarizes the facts with respect to these defendants together.

On June 11, 2011, Foster brought felony intimidation charges against Simpson. Compl. ¶ 89. Foster successfully argued for a $75,000 bond, which Simpson deemed unwarranted. *Id.* Simpson additionally alleges that Foster falsified a verified statement of arrest in arguing for this bond. *Id.* ¶ 259. Foster later continued the date of Simpson's trial, dismissed the felony charge against him, and brought a misdemeanor charge. *Id.* ¶¶ 122–23. Bennett was involved in the prosecution for the misdemeanor charge. *Id.* ¶ 262. Simpson was acquitted on the misdemeanor charge. *Id.* ¶ 124. On October 17, Foster testified under subpoena by Simpson in a civil lawsuit. *Id.* ¶ 148.

On September 4, 2012, Simpson filed a civil rights lawsuit in Illinois state court, naming numerous defendants, including Yoder, alleging that he had violated Mr. Simpson's civil rights in his role as SA. *Id.* ¶ 144. The case was removed to the Federal District court in Peoria as *Simpson v. City of Bloomington et al*, No. 12-cv-1430 (C.D. Ill. 2013). *Id.* Shortly after Simpson's arrest on December 8, 2012 for criminal threats, Simpson alleges that Chambers helped overcharge or otherwise magnify the charges against Simpson to inflate the value of Simpson's bond to $75,000. Compl. ¶ 168. In both of Simpson's arrests and prosecutions, the office of the Bloomington State's Attorney prosecuted him.

## XIII.      Defendant Emery

Mike Emery is the sheriff of McLean County. On May 12, 2011, Chief McKinley asked Emery to have Simpson followed in the McLean County Law and Justice Center. Compl. ¶ 73. On May 24, Simpson contacted Emery about being followed by sheriff's deputies in the Law and Justice Center. *Id.* ¶ 79. Emery refused to discuss the matter. *Id.* Simpson noticed that he was no longer being followed by deputies for some period of time. *Id.*

Emery allegedly conveyed false allegations of an unspecified nature about Simpson to Judge Robb. *Id.* ¶ 84. On August 11, Simpson filed a complaint against Emery with Judge Robb. *Id.* ¶ 99. On August 17, the chief sheriff's deputy, Rusty Thomas, ordered another deputy to follow Simpson while he was in the courthouse. *Id.* ¶ 98. On August 29, BPD Lt. Paul Williams claimed—allegedly citing information given him by Emery—that Simpson had criticized Judge Costigan and the judicial system in an email, and was fixated on Costigan. *Id.* ¶¶ 110–11. On September 18, a newspaper story ran in the Pantagraph; the story was allegedly retaliatory by or on the behalf of Emery. *Id.* ¶ 113. The article described Simpson as a courthouse threat. *Id.*

## DISCUSSION

The Complaint lists seven different civil rights counts, each encompassing a different group of defendants:

**(1)** conspiracies to violate Simpson's right to due process and violations of his right to due process under the Fourteenth Amendment, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as to Defendants Robb, Costigan, Freitag, Chambers, and Emery, for making and putting into effect various adverse judicial determinations at different times against Simpson;

**(2)** conspiracies to violate Simpson's right to freedom of speech and violations of his right to freedom of speech under the First Amendment, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as to Defendants McKinley, Stanesa, Yoder, Freitag, Cyrulik, Craft, Wikoff, Albert, Ashmore, Shriver, Engle, Sutherland, Mark Quah, Sarah Quah, Jones, Costigan, and Bennett, for difficulties suffered by Simpson in pursuing journalism while incarcerated and more generally

for threats and intimidation directed toward Simpson in the exercise of his First Amendment rights;

(3) failure to implement appropriate policies, customs, and practices, pursuant to 42 U.S.C. § 1983, as to Defendants McKinley and City of Bloomington, for various harassing behavior toward Simpson by the Bloomington Police Department;

(4) unlawful seizure and conspiracy to commit unlawful seizure in violation of the Fourth Amendment, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as to Defendants Ashmore, Shriver, Sutherland, and Jones, based on police removal of Plaintiff's son from Simpson's house during a domestic dispute on September 25, 2010;

(5) unlawful arrest and conspiracy to commit unlawful arrest in violation of the Fourth Amendment, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as to Defendants Craft, Albert, Foster, Stanesa, Mark Quah, Sarah Quah, McKinley, Yoder, Engle, and Albert, for activity resulting in arrest and felony allegations in June 2011 and testimony related to that arrest;

(6) unlawful arrest and conspiracy to commit unlawful arrest in violation of the Fourth Amendment, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as to Defendants McKinley, Yoder, Foster, Costigan, and Wikoff, for various activities in October 2011 leading to Simpson's arrest while on bond and loss of custody of his children; and,

(7) malicious prosecution and conspiracy to maliciously prosecute in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as to Defendants McKinley, Yoder, Foster, Bennett, Stanesa, Craft, Wikoff, Albert, Engle, Mark Quah, and Sarah Quah, for various acts taken by Illinois State's Attorneys in prosecuting Plaintiff at various times.

A district court is "required to liberally construe the pro se plaintiff's pleadings, however inartfully pleaded." *Ricketts v. Midwest Nat'l Bank*, 874 F.2d 1177, 1183 (7th Cir. 1989) (internal quotation marks omitted) (collecting cases). Even under this especially solicitous review, Simpson's case cannot proceed because this Court lacks jurisdiction over some of his claims, many of the Defendants are immune from his claims, and Simpson otherwise fails to state claims on which relief may be granted.

## I. Legal Framework

In ruling on a defendant's motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). In doing so, the facts set forth in the complaint are viewed "in the light most favorable to the nonmoving party." *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995).

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint "must actually suggest that the plaintiff has a right to relief." *Arnett*, 658 F.3d at 752 (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)). In evaluating a complaint, a court first determines which allegations, if any, are "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). "Bare assertions" that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim are "conclusory and not entitled to be assumed to be true." *Id.* at 681 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court then considers the claims remaining and determines whether these "plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 681. To do so, they must plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Arnett*, 658 F.3d at 752 (quoting *Iqbal*, 556 U.S. at 678). In other words, the plaintiff's allegations must demonstrate that the claim "is plausible, rather than merely speculative." *Tomayo*, 526 F.3d at 1083.

For a § 1983 claim to survive a motion to dismiss, a plaintiff's allegation must allege plausibly, under the pleading standards of *Iqbal*, that defendant was directly or indirectly responsible for the claimed deprivation of constitutional rights. Either "a plaintiff must establish defendant's personal responsibility for the claimed deprivation of a constitutional right," *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981), or, in the case of an allegation against a supervisor, "there must be a showing that the official knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act," *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). For conspiracy liability, a plaintiff must show agreement amongst defendants to deprive plaintiff of his rights, and that he was actually deprived of those rights by over acts taken in furtherance of the conspiracy. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988).

### Analysis

### A.     Robb, Costigan, and Frietag

To the extent Simpson seeks review of cases that Judges Robb, Costigan, and Frietag resolved against him, this Court lacks jurisdiction because of the *Rooker-Feldman* doctrine. *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). *Rooker-Feldman* prevents federal district courts from reviewing cases in which "the losing party in state court filed suit in federal court after the state proceedings ended." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005). "[J]udges have long

enjoyed a comparatively sweeping form of immunity," which discourages collateral attacks in favor of appellate procedures, and "insulat[es] judges from vexatious actions prosecuted by disgruntled litigants." *Forrester v. White*, 484 U.S. 219, 225 (1988). The remaining allegations against the judges, of shadowy ex parte communications and various vaguely described conspiracies, are primarily legal conclusions not accorded the assumption of truth. *See Iqbal*, 556 U.S. at 679. The few factual allegations are too vague to raise a plausible inference of misconduct. *See id.* Judge Costigan's statements while being interviewed by Wikoff, Compl. ¶ 106, and Judge Freitag's receipt of an email from Lt. Williams, certainly do not make out a case that the judges conspired to or did deprive him of his constitutional rights.

### B.     Defendant McKinley

Simpson alleges in Counts II, III, V, VI, and VII that Defendant McKinley, former police chief of Bloomington, violated his First Amendment rights by: hindering his ability to publish while incarcerated; failing to implement adequate policies in the BPD, resulting in Simpson's harassment; coordinating false statements and information about Simpson surrounding his June 2011 arrest; unlawfully causing Simpson to be arrested in October 2011; and aiding in his malicious prosecution at various times.

McKinley argues that all of Simpson's claims against him are barred by *res judicata*, that Simpson fails to claim he has been deprived of a property or liberty interest of constitutional proportion, and that all of McKinley's alleged behavior falls within the scope of qualified immunity.

There is no need to determine which portions of McKinley's conduct may be barred under res judicata, because he is shielded by qualified immunity. "[Q]ualified immunity protects

government agents from liability when their actions do not violate "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (quoting *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010).

As to Count 2, Simpson suggests that Defendant McKinley "stymied" his First Amendment rights by "blocking police reports and citizens [sic] complaints." Compl. ¶ 218. But Plaintiff does not explain how McKinley might have been responsible for blocking such reports, or even in what their blockage consisted. The statement is conclusory, and does nothing plausibly to implicate McKinley in any wrongdoing. Moreover, he does not explain how the alleged interference with reports might have been connected to a violation of his First Amendment rights. Simpson's mere assertion the McKinley "blocked" police reports or citizens' complaints, without any more information, is insufficient to support any inference that his First Amendment rights were violated.

As to Count 3, while Simpson alleges that McKinley "implicitly or explicitly adopted and implemented careless or reckless policies . . . that included . . . allowing the Office of Professional Standards to routinely downplay and/or cover up police misconduct," Compl. ¶ 225 it is alleged nowhere in the Complaint that any alleged officer misconduct was a consequence of the training they received, or BPD policies. There is no showing that McKinley, as a supervisor, "knowingly, willfully, or at least recklessly" acted to infringe of Simpson's rights. *Hardiman*, 803 F.2d 269, 274

Similarly, while Counts V, VI, and VII allege that McKinley was twice involved in Simspon's unlawful arrest, and then in his malicious prosecution, no facts tying McKinley to

these arrests, beyond the fact that he was chief of BPD at the time, are alleged.  Similarly, no connection between McKinley and Simpson's prosecution is alleged.  None of the Complaint's allegations raise the reasonable inference that Simpsons' arrests were unlawful.

Simpson does not explain what actions of McKinley's, as an official at the BPD, led to the violation of any "clearly established" rights.  *See Hernandez,* 634 F.3d at 914.  Accordingly, McKinley's motion to dismiss is GRANTED as to all counts.

### C.    Defendant Engle

Simpson alleges: (1) in Count II that Defendant Engle conspired with others to violate Simpson's First Amendment rights by denying him access to certain materials while he was incarcerated and by threatening and intimidating him in the exercise of those rights; (2) in Count V that Engle conspired with other BPD officers and the Quahs to engineer his false arrest for a complaint about a loud stereo on June 11, 2011; and (3) in Count VII that Engle aided in his malicious prosecution by prosecutors.  Simpson also alleges Defendant Engle's involvement in Plaintiff's 2009 arrest.  Engle moves to dismiss on res judicata grounds, and because Plaintiff fails to state a constitutional claim.

As an initial matter, although none of the counts alleged against Defendant Engle mention Simpson's 2009 arrest, Simpson's Complaint discusses the arrest, and Engle is accused of participation in various conspiracies, so the Court addresses any part of Simpson's claim that relates to this arrest.  The doctrine of res judicata, or claim preclusion, bars relitigation of claims already adjudicated.  Res judicata applies when there exists: identity of the parties or their privies; identity of the cause of action; and a final judgment on the merits in the previous case.  *See Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011).  In

the instant case, Simpson has already litigated claims against Defendant Engle surrounding his 2009 arrest. *See Simpson v. Engle*, No. 10-CV-1394, 2011 WL 2014813 (C.D. IL, May 24, 2011). The parties were the same. The cause of action was, as here, civil rights claims surrounding Engle's participation in Simpson's arrest. *Id.* at *3. And there was a final judgment on the merits. *See id.* Therefore, any portions of Simpson's claims against Engle arising from these allegations are barred by res judicata.

The remaining facts in the Complaint against Engle fail to allege any violation of Simpson's constitutional rights. Engle is said to have written a "secret letter" to administrators at BPD claiming that Simpson was driving slowly by his house and harassing him, Compl. ¶ 83, and a letter to McKinley expressing concerns that Simpson would harm himself or others. *Id.* ¶ 95. Neither of these allegations establish "personal responsibility for the claimed deprivation of a constitutional right," as they must do to sustain a § 1983 claim against a defendant at the motion to dismiss phase. *See Duckworth*, 644 F.2d at p. 655. Nor do they make any showing of a conspiracy entered into by Engle to deprive Plaintiff of his rights. *See Scherer*, 840 F.2d at 442. The only other specific allegation against Engle is that, when Simpson drove slowly by Engle's house, Engle yelled at him. This is not a § 1983 violation. All other claims against Engle are legal conclusions not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 681. Accordingly, Engle's motion is GRANTED in whole.

**D.    Defendant Williams**

Paul Williams is a named defendant in Simpson's action, despite the fact that none of the seven civil rights allegations in the Complaint mentions Williams by name. Williams moves for

dismissal on the grounds that Simpson does not allege that Williams' actions deprived Simpson of any property or liberty interest sufficient to serve as the basis of a civil rights action.

The only mention of Williams in the Complaint is a brief, vague description of allegedly false statements he made about Simpson's statements regarding Judge Costigan.  Compl. ¶¶ 110–111.  Mere false statements made by government actors, even if they are defamatory, do not deprive an individual of property or liberty interests sufficient to invoke the protection of the Fourteenth Amendment unless they result in some alteration of an individual's legal status, or otherwise function to deprive him of liberty or property.  *See Paul v. Davis*, 424 U.S. 693, 709–710 (1976).   The Complaint does not support an inference that Williams' statements resulted in action violating Simpson's civil rights.  Accordingly, Defendant's motion is GRANTED.

### E.      Defendant Wikoff

Simpson alleges in Count VI that Wikoff conspired with the Quahs, district attorneys, and others to unlawfully arrest Plaintiff on October 2011 on a bond violation; and in Count VII that Wikoff conspired with McLean County prosecutors in his malicious prosecution.  Simpson also alleges that Wikoff "whitewashed" misconduct by Engle in an internal investigation in 2009.  Wikoff moves to dismiss Simpson's complaint entirely as it pertains to him, on the ground that certain of Plaintiff's claims are barred by res judicata, and that the Complaint otherwise fails to state a claim upon which relief can be granted.

As an initial matter, although none of the counts alleged against Wikoff mention Simpson's 2009 arrest, the facts alleged discuss this arrest, and Engle is accused of participation in various conspiracies, so the Court addresses any part of Plaintiff's claim that relates to this arrest.  In the instant case, Simpson has already litigated claims against Wikoff surrounding the

alleged "whitewashing" of internal misconduct in 2009. *See Simpson v. Engle*, No. 10-CV-1394, 2011 WL 2014813 (C.D. IL, May 24, 2011). The parties were the same. The cause of action was, as here, civil rights claims surrounding Defendant Wikoff's alleged cover-up of Defendant Engle's "misconduct." *Id.* at *3. And there was a final judgment on the merits. *See id.* Therefore, any portions of Plaintiff's claims against Defendant Wikoff arising from these allegations are barred by res judicata.

Simpson's allegations of conspiracy to falsely arrest and false arrest, and malicious prosecution, rest wholly on two conclusory and unsupported allegations to the effect that Wikoff did so conspire. *See* Compl. ¶¶ 251–52. *See Iqbal*, 556 U.S. at 681. The only allegation against Defendant Wikoff that remains is that Wikoff interviewed Plaintiff at the BPD offices on August 26, 2011, supposedly for the purposes of framing him. None of Simpson's allegations, here or elsewhere in the complaint, suggest a basis to infer this motive. Accordingly, Defendant's motion is GRANTED.

### F.        Defendant City of Bloomington

Simpson alleges in Count 3 that the City of Bloomington ("City") and Chief McKinley did not adequately train, supervise, or provide investigative oversight for citizen complaints, and that as a consequence, Mr. Simpson's First, Fourth, and Fifth Amendment rights were violated. The City moves to dismiss the Complaint as to itself, on the ground that Plaintiff fails to state a cause of action for a civil rights violation.

Plaintiff alleges that various unspecified defects in the City's training, supervision, and investigative oversight led to the violation of his constitutional rights. "[A] government entity is only liable under § 1983 when execution of a government policy or custom 'by its lawmakers or

by those whose edicts or acts may fairly be said to represent official policy' inflicts the injury of which the plaintiff complains." *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004) (quoting *Monell v. Dep't of Soc. Servs of City of New York*, 436 U.S. 658, 694 (1978)). Unconstitutional policies or customs take three forms: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a 'custom or usage' with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury." *Chortek*, 356 F.3d at 748.

Plaintiff alleges facts insufficient to identify an unconstitutional policy on behalf of the City in any of these categories. Plaintiff identifies no express policy responsible for any constitutional deprivation, or any permanent and widespread practice. And, as discussed above with respect to Chief McKinley, Simpson fails to suggest any policymaking action or decision that anyone in a position of authority took that he now complains of. Plaintiff simply describes BPD training policies as inadequate, a conclusory allegation that cannot sustain his claim. Accordingly, Defendant's motion is GRANTED in its entirety.

### G.     Defendant Cyrulik

Simpson alleges in Count II that Cyrulik conspired with others to violate his First Amendment rights by denying him access to certain materials while he was incarcerated and by threatening and intimidating him in the exercise of those rights. Cyrulik moves to dismiss this claim on the ground that Simspon fails to set forth any claim for a civil rights violation by Defendant Cyrulik. Accordingly, the Motion to Dismiss is GRANTED.

Simpson's only allegations against Defendant Cyrulik are that he inadequately investigated behavior of BPD officers that Plaintiff views as illegal, and, on one occasion, that he failed adequately to consider information conveyed to him by Plaintiff about that misconduct. Compl. ¶¶ 28, 49, 56. Such insufficiently aggressive activity or inactivity cannot support a due process or equal protection violation, let alone a First Amendment violation, because government officers have no constitutionally enforceable duty to investigate or prosecute misconduct. *See, e.g.*, *White v. City of Toledo*, 217 F.Supp.2d 838, 841–42 (N.D. Ohio 2002) (there is no "constitutional, statutory, or common law right that a private citizen has to require a public official to investigate or prosecute a crime" (internal quotation marks omitted). Here, Plaintiff alleges little more than that Defendant Cyrulik's internal investigations of BPD conduct did not meet Plaintiff's own standards of diligence. Accordingly, the Motion to Dismiss is GRANTED.

### H.  Defendant Stanesa

Simpson alleges in Count II that Stanesa conspired with others to violate Simpson's First Amendment rights by denying him access to certain materials while he was incarcerated and by threatening and intimidating him in the exercise of those rights; in Count V that Stanesa conspired with other BPD officers and the Quahs to engineer his false arrest for a complaint about a loud stereo on June 11, 2011; and in Count VII that Stanesa aided in his malicious prosecution at the hands of state prosecutors at various times. Stanesa moves to dismiss, ECF No. 38, all of Simpson's claims on the grounds that Sipson fails to allege a violation of his constitutional rights.

Initially, all of Simpson's allegations against Defendant Stanesa arising from the incidents of February 23, 2011, are too vague and conclusory to be assumed true. Simpson

alleges that Defendant Stanesa arranged for BPD officers to harass him at a court hearing, but does not explain why or how this might have happened, and provides no information to support the inference that Defendant Stanesa was behind any supposed harassment.  *See* Compl. ¶ 58. Simpson similarly alleges no plausible basis for his charge that Defendant Stanesa did not correct Ms. Quah's supposed perjury on the same occasion.  Finally, Simpson offers nothing in support of his allegation that Defendant Stanesa was responsible for ordering extra patrols of his house on the same day.  *Id.* ¶ 60.  Even if the Court were to credit the final allegation with truth, calling extra patrols on Simpson's house does not violate any of Simpson's "clearly established" constitutional rights, and thus cannot be the basis for a civil rights action.  *See Fitzgerald*, 457 U.S. at 817.

Many of Simpson's later allegations of Stanesa's misbehavior are similarly too vague and unsubstantiated to be accorded the assumption of truth.  Simpson's claim that Stanesa damaged his reputation within the department is one such allegation, Compl. ¶ 212; the various allegations of conspiracy involving him and BPD officers, including the events surrounding his arrest on June 11, 2011, are others.  The only facts Simpson pleads about Stanesa with any particularity are that on February 28, 2011, Stanesa came to Simpson's home and attempted to dissuade Simpson from pursuing charges against the Quahs, making unspecified false claims during the conversation.  *Id.* ¶ 62.  This charge, on its own, does not implicate the violation of Simpson's constitutional rights, much less any "clearly established right, and Plaintiff is therefore entitled to qualified immunity.  *See Fitzgerald*, 457 U.S. at 817.  Accordingly, Stanesa's motion to dismiss is GRANTED.

## I.        Defendants Sarah and Mark Quah

Simpson alleges: (1) in Count II that the Quahs conspired with others to violate Simpson's First Amendment rights by denying him access to certain materials while he was incarcerated and by threatening and intimidating him in the exercise of those rights; (2) in Count V that the Quahs conspired to engineer his false arrest for a complaint about a loud stereo on June 11, 2011; in Count VI that the Quahs conspired with police, district attorneys, and others to unlawfully arrest Simpson in October 2011 on a bond violation; and in Count VII, that the Quahs were somehow involved in his malicious prosecution.  Defendants move to dismiss, ECF No. 44, because they are not state actors, and under *Noerr-Pennington* immunity.

Simpson's allegations against the Quahs fail to state a claim upon which relief can be granted because the Quahs were not state actors and at no time acted "under color of state law," as a private actor must do in order to be able to incur liability under section 1983.  *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).  Furthermore, Simpson alleges that the Quahs engaged in a conspiracy with BPD officers on the occasion of both of his arrests, but "[t]o establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, . . . and (2) those individual(s) were 'willful participant[s] in joint activity with the State or its agents.'" *Fries v. Helsper*, 136 F.3d 452, 457 (quoting *Adickes v. S. H.  Kress & Co.*, 398 U.S. 144, 152 (2009)).

Here, Simpson alleges only that Ms. Quah called DCFS with false information on November 10, 2010, Compl. ¶ 50, later perjured herself in testimony about the incident, *id.* ¶ 59, and that the Quahs called about a loud stereo on June 22, 2011.  *Id.* ¶ 88.  The conclusory

allegation that the Quahs conspired with officers of the BPD is not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679. The factual allegations in Counts II, V, and VI do not support a plausible inference that the Quahs on either occasion acted under color of state law, reached an understanding with officers, or were willful participants in any scheme to deprive Simpson of his constitutional rights. There is similarly no inference of conspiracy or any affiliation with government actors to support Count VII's claim that the Quahs conspired in his malicious prosecution. Accordingly, Mark and Sarah Quah's motion is GRANTED in its entirety.

### J. Defendant Jones

Simpson alleges in Count II that Defendant Jones conspired to violate his First Amendment rights to free speech by denying him access to certain materials while he was incarcerated and by threatening and intimidating him in the exercise of those rights, and in Count IV that Jones conspired with the BPD to engineer the removal of their son from Simpson's house on September 25, 2010. Jones filed an answer, ECF No. 50, that also moves to dismiss Simpson's complaint with respect to Defendant Jones for failure to state a claim.

Simpson's charge in Count 2 that Defendant conspired with unnamed others to deprive him of his first amendment rights is supported by no allegations of any kind, and is dismissed.

In Count 4, Simpson alleges that Jones conspired with police officers in the removal of their son from his house on September 25, 2010. However, Simpson's claim against Defendant Jones under § 1985 is not cognizable, because Jones was not "acting under color of state law." *Dennis*, 449 U.S. at 27. While Simpson alleges that Defendant Jones "cannot escape culpability or complicity" in a conspiracy to have Simpson's son removed from his home, Compl. ¶ 236, the allegation is merely conclusory, and Simpson states nothing about Defendant Jones's supposed

collaboration with police officers. The Complaint merely alleges that Defendant Jones told their son to run away from Simpson's house, *id*. ¶ 22, that Jones told DCFS that Simpson had hit their child, *id*. ¶ 29, that Jones made unspecified allegations to BPD on the September 25, *id*. ¶ 34, and that Jones filed for an Order of Protection that was based on misrepresentations. *Id*. ¶ 42. *See Helsper*, 146 F.3d at 458 ("[M]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss"). Accordingly, Defendant's motion is GRANTED.

### K.      Defendants Albert, Ashmore, Craft, Shriver, and Sutherland

Simpson alleges in Count II that Albert, Ashmore, Craft, Shriver, and Sutherland conspired to deprive him of his First Amendment rights, both by hindering his access to journalistic materials while he was incarcerated and by threatening him in the exercise of his First Amendment rights at other times; in Count IV that Ashmore, Shriver, and Sutherland conspired to and did unlawfully enter his home and take his son, JLS, on September 25, 2010; in Count V that Albert and Craft conspired to and did arrest him in June 2011 in violation of his Fourth Amendment rights; and that Albert and Craft conspired to maliciously prosecute him along with Illinois State's Attorneys, and conspired to violate his due process rights. Defendants move jointly, ECF No. 57, to dismiss the complaint as to Defendants on all counts, for failure to state a claim upon which relief can be granted, because custody disputes should not be resolved in federal court, because the various perjury claims do not amount to civil rights violations, and because Simpson's civil rights were not violated as a consequence of his various arrests.

Simpson alleges in Count II that all of these defendants conspired "in a continuum [sic] effort to injure, oppress, threaten, and intimidate" him in the exercise of his First Amendment

rights. Compl. ¶ 222. However, Simpson identifies no instances in which Albert, Ashmore, Craft, Shriver, or Sutherland did anything that infringed on his constitutionally protected freedom of expression. Furthermore, he makes no allegations supporting their involvement in or affirmative action toward the furtherance of a conspiracy, beyond the conclusory statement that they were involved in one. *See Iqbal* at 680.

In Count IV, Simpson alleges that Ashmore, Sutherland, and Shriver's actions on September 25, 2010, when they came to his house and took his son, JLS, into protective custody, violated his Fourth Amendment rights. As an initial matter, Simpson's statement that Officer Sutherland "staged a false call" to permit Ashmore and Shriver to come to his house is unexplained, and unsupported by any further allegations in the Complaint. *See* Compl. ¶ 35.

As for Ashmore and Shriver's actions in relieving Simpson of custody of his son, Simpson does not allege sufficient facts to support an inference that his Fourth Amendment rights were violated. Simpson asserts that Officers Ashmore and Shriver, in taking his son into custody, "fulfilled Shriver's earlier threat and took JLS into protective custody without stating allegations or making an arrest," *id.* ¶ 36, and did so without a warrant or probable cause. *Id.* ¶ 238. However, Simpson admits that officer Ashmore and Shriver received a phone call that caused them to take his son into custody, although he claims that this call was manufactured. Simpson also details events surrounding a subsequent series of custody hearings, *id.* ¶¶ 39–46. These hearings evidently involved DCFS caseworkers, *id.* ¶ 41, the children's mother, Ms. Jones, *id.* ¶ 42, a "detailed outline of events" supplied by Simpson himself, *id.* ¶ 43, testimony by Officer Ashmore, *id.* ¶ 44, and the involvement of a DCFS investigator, *id.* ¶ 48, who ultimately

determined that Simpson's claims of police and other misconduct in the incident were unfounded.

The Seventh Circuit has determined, in the context of police intervention to remove a child from his parents' custody, that Fourth Amendment rights are not violated if officers or case workers acted with probable cause and a prompt judicial determination of probable cause is made. *Donald v. Polk County*, 836 F.2d 376, 384 (7th Cir. 1988). Here, Simpson makes no allegations that would support the inference that the officers did not have probable cause to seize JLS, and proceeds to describe in patchy detail a series of events surrounding what appears to be a post-deprivation hearing. In short, Simpson pleads no facts that suggest Ashmore and Shriver lacked probable cause on this occasion, or that his Fourth Amendment rights were violated. Furthermore, even if the officers acted in bad faith, as Simpson alleges, a § 1983 claim is foreclosed if a state court has determined that probable cause existed, as Simpson has suggested it did in this case. *See Allen v. McCurry*, 449 U.S. 90, 102, n. 18 (1980).

In Count V, Simpson alleges that Craft and Albert participated in a conspiracy to fabricate felony allegations against him and conspired in engineering his unlawful arrest. Compl. ¶ 242. Simpson does not further describe the incident. According to Defendants, these allegations most likely relate to Plaintiff's arrest for disorderly conduct after a call from the Quahs. Mem. in Supp. of Mot. to Dismiss at 2. Beyond Simpson's mere assertion that his arrest was unlawful, and that there was a conspiracy against him, Simpson alleges nothing in support of his contention that the arrest and surrounding events violated his Fourth Amendment rights. This mere assertion of legal conclusions cannot support his claim. *See Iqbal* at 680.

In Count VII, Simpson states that Albert and Craft conspired with prosecutors to violate his right to due process by maliciously prosecuting him. However, such conspiracy requires "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights." *Scherer*, 840 F.2d at 442. Here, Simpson has merely alleged a malicious prosecution and no specific connections or overt acts of conspiracy between Albert and Craft and the prosecutor co-defendants. Without more, Simpson's claim under Count VII, as with his other claims, cannot survive Defendants' Motion to Dismiss. Accordingly, Defendants' motion is GRANTED in its entirety.

### L. Defendants Chambers, Yoder, Foster, and Bennett

Simpson alleges: (1) in Count I that Chambers conspired to violate his due process rights, in Count II that Yoder and Bennett conspired to violate his first amendment rights by denying him free access to certain materials while incarcerated, in Count V that Yoder and Foster conspired to unlawfully arrest him in June 2011, in Count VI that Yoder and Foster conspired to unlawfully arrest him on October 2011 on a bond violation, and in Count VII that Foster, Yoder, and Bennett maliciously prosecuted him. Defendants move to dismiss on the basis of prosecutorial immunity and Simpson's failure to state claims upon which relief can be granted.

Simpson's claims against Chambers, Yoder, Foster, and Bennett fail largely because most of them are so conclusory and unsupported as not to be "entitled to the assumption of truth," *Iqbal*, 556 U.S. at 680. Where the claims can be deciphered, they relate exclusively to the prosecutor's absolute immunity for activity "intimately associated with the judicial phase of the [legal] process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). "[I]n initiating a prosecution

and in presenting the State's case, the prosecutor is immune from a civil suit for damages under §

1983." *Id*. at 431.

Simpson asserts that "[m]alicious ex parte communications were a hidden, driving force"

in SA Chambers' initiation of criminal proceedings against him, but never details what these

communications might have been, their connection to Chambers's actions, or what causes him to

believe they exist in the first place. Compl. ¶ 203. Accordingly, Count I is insufficient to state a

claim.

Simpson next asserts that Yoder and Foster were responsible for his unlawful arrest in

June 2011, either directly or by way of conspiracy—he does not specify. But no facts at all are

alleged connecting Yoder and Foster to Simpson's actual arrest. And insofar as Simpson

intends, by listing these defendants at the end of Count V, to inculpate Yoder and Foster for his

prosecution following the arrest, Yoder and Foster are absolutely immune from § 1983 liability

in their initiation and presentation of the case against Simpson.

Simpson asserts again in Count VI that Yoder and Foster "conspired to falsely arrest Mr.

Simpson with a disorderly conduct (honking horn) warrant based on false testimony from Quah."

Compl. ¶ 251. However, Simpson's mere description of the arrest as "false" is not entitled to the

assumption of truth, because he provides absolutely no grounds to infer that the arrest was

illegitimate; his various descriptions of testimony given to support it as false and the ensuing

arrest as illegal are not entitled to the assumption of truth. *See Iqbal* at 680. Further, nothing

more than Simpson's use of the word "conspiracy" substantiates Yoder or Foster's involvement

at any time during the arrest.

Finally, in Count VII, Simpson alleges that Foster used a "fabricated police report . . . to create a factually baseless charge of felony Intimidation [sic]," Compl. ¶ 258; that Bennett "pursued the misdemeanor trial [against Plaintiff] fully aware that the case never should have been filed," *id*. at ¶ 262; and that Yoder and Bennett "did willfully conspire and agree . . . to injure, oppress, threaten, and intimidate" Plaintiff. *Id*. ¶ 263. Simpson provides no reason, beyond his bare assertion, to believe that the police report in this case was fabricated, or that Foster used a fabricated police report to maliciously prosecute him. He provides no reason to believe that Bennett was "fully aware" that the case against Simpson should never have been filed. Indeed, Simpson's detailed recitation of the facts of his arrest and subsequent decision to prosecute him more plausibly suggest that Bennett in good faith believed that the case should have been filed and prosecuted. And, Simpson suggests nothing at all to support his allegation of conspiracy. These conclusory allegations are insufficient to support his claim. *See Iqbal* at 680. Further, insofar as they relate to these prosecutors' official activities at any phase of judicial process against Simpson, the claims fail because of prosecutorial immunity. *See Imbler*, 424 U.S. at 430. Accordingly, Defendants' motion is GRANTED in its entirety.

## M.    Defendant Emery

Simpson alleges in Count I that Emery conspired with other Bloomington City and McLean County officials, and members of the Illinois judiciary, to violate his rights to due process of law; and in Count II that Emery conspired to violate his First Amendment rights to free speech by denying him access to certain materials while he was incarcerated and by threatening and intimidating him in the exercise of those rights. Emery moves, ECF No. 64, to dismiss on the grounds that Simpson has failed to allege any individual constitutional violations

by Emery or his involvement in a conspiracy, and that Emery is entitled to qualified immunity for his alleged actions.

Simpson asserts that Emery passed "false allegations" to Judge Robb about Simpson in an attempt "to damage Mr. Simpson's civil and criminal cases." Compl. ¶ 84. But Simpson does not specify what those allegations were, how they were transferred, or why he has any reason to believe they exist. Simpson also claims that on August 29, 2011, Lieutenant Paul Williams used information Emery had given him—claiming that Simpson had criticized and was fixated on Judge Costigan—in an email. *Id.* ¶¶ 110–11. But Simpson does not state what reason he has to believe that Emery had anything to do with the email. Simpson also alleges that an uncomplimentary story ran in a local newspaper about him, and that Emery was somehow responsible, but says nothing about how or why Emery might have been responsible. *Id.* ¶ 113. None of these bare, conclusory assertions are entitled to the assumption of truth. *See Iqbal* at 680. With these assertions properly disregarded, the Complaint does not support any inference of Emery's involvement in a conspiracy to deprive him of his due process rights.

Simpson alleges that he was followed in the McLean County Law and Justice center by Sheriff's deputies, and Emery, in his official capacity as Sheriff, was responsible for this. Compl. ¶ 73. According to Simpson, when he confronted Emery about the following, it stopped, although it was once repeated. *Id.* ¶ 98. But Simpson does not explain how being followed on one or two occasions amounted to a violation of his due process rights. These alleged facts do not demonstrate that a claim of due process violation under § 1983 is "plausible, rather than merely speculative." *Blagojevich*, 526 F.3d at 1083. Accordingly, the claims against Emery in Count I are dismissed. As to Count II, even presuming that Emery was sheriff while Simpson

was incarcerated in McLean County Jail, Simpson makes no allegations that Emery, through policy or conspiracy, was responsible for any deprivation of his First Amendment rights while incarcerated. *See Rascon*, 803 F.3d at 274; *Scherer*, 840 F.2d at 442. The Count II claims against Emery are therefore dismissed as well. Accordingly, Emery's motion is GRANTED as to all counts in which he is charged.

## CONCLUSION

Defendants' Motions to Dismiss, ECF Nos. 10, 14, 16, 19, 24, 34, 36, 38, 44, 47, 50, 59, and 64, are GRANTED. Plaintiff's Complaint, ECF No. 1, is DISMISSED. Plaintiff's Motion to Submit Evidence, ECF No. 100, is MOOT. The Clerk is directed file a redacted copy of Defendant Jones's improperly filed Answer and Motion to Dismiss, ECF No. 50 and enter judgment, closing the case.


Entered this 29th day of September, 2014.


<u>            s/Sara Darrow            </u>
SARA DARROW
UNITED STATES DISTRICT JUDGE